**STATE v. RAULERSON, et al.**

Circuit Court, Marion County, Criminal Appeal.

July 17, 1956.

Charles A. Savage, Ocala, for appellants.

A. P. Buie, Ocala, State Attorney, for appellee.

T. G. FUTCH, Circuit Judge.

This is a criminal action wherein the defendants were tried and convicted of taking or attempting to take a buck deer between sunset and a half-hour before sunrise. The actual charge as made, charges them with "unlawfully" taking or attempting to take a game animal, to-wit, a buck deer during prohibited hours. The warrant charges that the taking took place "between a half-hour before sunset and half-hour before sunrise" while the affidavit upon which the warrant was issued charges the act took place "between sunset and a half-hour before sunrise."

Motion in behalf of defendants for a bill of particulars was granted. Neither the affidavit nor the warrant specified the kind of game animal involved nor the method or means by which the defendants were accused of taking or attempting to take such animal. The order granting the motion provided that the "bill of particulars should state the kind of game animal that the defendants are charged with unlawfully taking, whether or not the said game animal was alive or dead or both and, if dead, what the

apparent cause of death appeared to be." Mr. E. G. Musleh, county prosecuting attorney, furnished the bill of particulars which, omitting the formal parts, was as follows—

"1. The kind of game animal that the defendants are charged with unlawfully taking is described as a buck deer.

"2. The said buck deer was alive prior to the taking by the defendants, and was dead at the time the defendants attempted to take said deer.

"3. The apparent cause of death of said buck deer was a bullet wound inflicted by a gun."

Motion to quash the affidavit as amended by the bill of particulars was made which motion was denied.

Thereafter and on the same day that the defendants were put to trial, the prosecuting attorney without motion for or order allowing the same filed an "Amended Bill of Particulars" in which it is alleged that the animal in question was a "buck deer" and "2. The said buck deer was alive, that the defendants then shot and killed said buck deer at the time and place alleged in affidavit in said cause and the defendants then attempted to take said buck deer." This amended bill of particulars, if it were properly allowed to be filed (which proposition it will not be necessary to discuss or decide as will later appear) did not change in any essential manner the original bill of particulars but left the defendants, as before, charged with taking a "dead" animal.

There is not any law or statute in Florida making the "taking or attempting to take a buck deer" whether dead or alive a crime. The gravamen of the offense for which the defendants were tried and convicted is and, of necessity, must have been, the violation of some rule or regulation of the Game and Fresh Water Fish Commission because there is, as above stated, no law prohibiting the doing of what defendants were alleged to have done.

We have several of such boards and commissions in Florida clothed with authority to adopt "monkey legislation." I have borrowed the name "monkey legislation" from an attorney of the Game and Fresh Water Fish Commission who, in arguing another case before me involving this same commission, used the term in referring to a particular method of taking fish as "monkey fishing."

Just what rule or rules, regulation or regulations the defendants are alleged to have violated has not been revealed to this court by the record or otherwise.

In cases such as this it is necessary for the state to charge the defendant with violating a particular regulation and to allege the regulation or regulations he is charged with violating and to prove at trial the valid adoption and existence of such regulation or regulations as alleged and to introduce a copy of such rule properly authenticated in evidence for the use of the jury. This "monkey legislation" is not accorded and cannot be accorded the status and dignity of legitimate legislation by the state legislature.

The motion to quash, while not a model which is apt to be copied in any book of forms as a precedent, is sufficient to present to the court for decision the validity of the charge on which these defendants were forced to go to trial and upon which they were placed in jeopardy, and the motion to quash should have been granted. The filing of the "Amended Bill of Particulars" when the case was called for trial was a complete farce and should not have been allowed. However, since the evidence was reported and is before us, we will give the merits of the case consideration.

The evidence was presented to a jury and they brought in a verdict of guilty. The further question before this court is whether or not the evidence was, as a matter of law, sufficient to warrant and sustain that verdict.

The evidence produced by the state is essentially as follows—

1. Employee Seckinger was stationed about 30 or 40 yards south of state road 40 in the national forest.

2. Soon after dark he heard what he took to be a rifle fire to the north and west of his location. He testified positively that the shot was fired "approximately 200 yards west down the highway from where I was." He did not see anyone fire the shot. He only heard the sound.

3. The shot was fired "right after first good dark."

4. Soon after the shot he heard a vehicle leave "that spot" as he testified, going west.

5. He walked to the place on the highway where he believed the shot had been fired.

6. There was considerable traffic on the road, cars going both directions.

7. One minute after Seckinger stopped on the highway at the spot where he believed the shot was fired a Chevrolet, two-tone vehicle, drove up from the west and stopped. Seckinger heard two

male voices coming from the car. One voice said, "I will get out and get it" and the other voice said, "I see a car coming." What happened to this stopped car and its occupants is not further accounted for. (Transcript of testimony, page 4). While the first car was stopped another vehicle came by—another two-tone Chevrolet—going west. This last car, according to Seckinger, came back in a few minutes going west but did not stop. There were several cars at this time going both ways. Within a few more minutes this same car which had gone west (according to Seckinger) came back from the west and stopped. Two men got out of the car and "went across the road right-of-way *into the woods and came back to the deer*" (Seckinger, transcript of testimony, page 4). This is the first mention of the deer by Seckinger and is very important in view of his later testimony—to this point nothing had been said about these men touching the deer.

Yet, the prosecuting attorney asked this question—"The two people that came out with that deer, can you identify them as the defendants here?" Seckinger in response identified the defendants.

At this point and after the defendants were in full view of him, Seckinger approached them. Here is the first instant that the defendants are said to have seen or contacted the deer. Up to this point the witness had not admitted seeing the deer. Its throat had been cut.

8. The defendants were arrested by Seckinger as they approached the car with the deer.

9. Seckinger testified that defendants went back into the brush from the right-of-way 22 feet. Yet, he and other state witnesses testified that the brush was "so thick" at that point "looking from the road," and introduced photographs made in the daytime to prove it. How far defendants went into the brush is of no material moment for the simple reason that Seckinger had already testified that they crossed the right-of-way, went into the woods and *came back to the deer*.

10. The state undertook to prove that this particular deer had been lying dead in the bushes 22 feet back from the right-of-way. Its witnesses testified that there was scattered blood and hair back to that point from the right-of-way. However, we must remember that the shot which the state claims hit the deer had been heard at least a half hour before then and that this deer's throat had been cut at some time. Yet, there was no large amount of blood found at this place in the bushes. In fact, the state's witnesses would not

admit seeing any large quantity of blood at any place. According to them it was scattered all over the place. However, witnesses did not see blood on either defendant, in fact, they did not look for any blood on the defendants, they said.

11. Seckinger testified that defendants had two high power .222 rifles in their car loaded with soft nose bullets.

12. Seckinger testified that there was a large wound on the extreme left rear of the deer—a *large hole measuring two inches by two and one-half inches.*

There was no evidence for the state of any other wound on this deer except that its throat had been cut.

There was no evidence for the state that these defendants, or either of them shot or killed the deer.

There was no evidence for the state that these defendants or either of them ever saw the deer while it was alive.

The state relied largely on circumstantial evidence. None of the circumstances proven were inconsistent with the innocence of the defendants, nor were any of the acts of the defendants as proven inconsistent with innocence.

Doubtless the jury, in finding a verdict of guilty, had in mind the bill of particulars filed by the prosecuting attorney which stated that the deer was dead when defendants attempted to take it.

If the prosecuting attorney was as reckless and indifferent of what had been testified to by the witnesses in his argument to the jury as he was in his argument on the appeal before this court, the jury doubtless was mislead to some extent by him. The jury has a right to depend upon the prosecuting attorney to properly and accurately summarize and present to them the testimony that has been given. Too often, however, a prosecuting attorney forgets his responsibility in his zeal for a record of convictions rather than a record of lending his efforts to effectuating the orderly administration of justice within the law.

The motion interposed in behalf of defendants at the close of the state's case should have been granted by the trial court. The evidence was far from legally sufficient to sustain a verdict of guilty.

For the reasons stated, the judgment and sentence of the trial court will be reversed, vacated and set aside, with instructions to dismiss the case and return to defendants all property belonging to them now held by the court or its offices.